[Cite as *Sabath v. Sabath*, 2020-Ohio-4638.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STEVEN P. SABATH, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NOS.  2019-L-154** |
| | | **2020-L-009** |
| RICK J. SABATH, | : | |
| Defendant-Appellant. | : | |

Civil Appeals from the Lake County Court of Common Pleas, Case No. 2018 CV 000091.

Judgment: Affirmed.

*Mark A. Ziccarelli* and *Deneen LaMonica*, Ziccarelli & Martello, 55 Public Square, Suite 1717, Cleveland, OH 44113 (For Plaintiff-Appellee).

*Tim L. Collins* and *Katie E. Christman*, Thrasher, Dinsmore & Dolan, LPA, 1111 Superior Avenue, Suite 412, Cleveland, OH 44114 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1}     Defendant-appellant, Rick Sabath, appeals from judgments of the Lake County Court of Common Pleas, denying his motion for judgment notwithstanding the verdict on a breach of contract claim raised by plaintiff-appellee, Steven Sabath, granting Steven's motion for directed verdict on an unjust enrichment counterclaim, granting an award of prejudgment interest in favor of Steven, and denying Rick's request to admit deposition testimony of a witness at trial.  For the following reasons, we affirm the decision of the lower court.

{¶2}    On January 16, 2018, Steven Sabath filed a Complaint against Rick Sabath, his son, in the Lake County Court of Common Pleas, a refiling of a 2015 Complaint. The Complaint alleged that Steven sold 400 shares of stock of his company, Air Tool Service Company (ATSCO) to Rick for $890,000 pursuant to a purchase agreement, on January 1, 2001, and that the principal and interest were due and payable on February 17, 2005. It alleged that Rick agreed to make various other payments for Steven's expenses, including life and health insurance, automobile payments, and an American Express account pursuant to the purchase agreement and an employment agreement. It contended that Rick had stopped making payments under the purchase agreement in 2014. The Complaint raised claims for the following: Breach of Contract for Rick's breach of the purchase and employment agreements; Promissory Estoppel and Unjust Enrichment relating to those agreements; and Fraud/Misrepresentation and Conversion relating to Rick's statements regarding inability to pay under the purchase agreement and issues relating to Rick's sale of ATSCO to a third party. The Complaint was subsequently amended to separate the Fraud and Misrepresentation claims and further address the sale of ATSCO and stock transfer issues.

{¶3}    Rick's Amended Answer raised a counterclaim for Unjust Enrichment, alleging he had made payments in excess of the purchase price of ATSCO, and requesting restitution.

{¶4}    On October 25, 2019, Steven filed a motion to use his videotaped trial testimony in lieu of live appearance at trial due to his declining health.

{¶5}    A jury trial was held on October 29 through November 1, 2019. The following pertinent arguments, testimony, and evidence were presented:

2

{¶6} Steven Sabath's video deposition was played. Steven testified that he had been the president of ATSCO, which serviced and rebuilt tools, and ran the operations of the company for a number of years, ultimately becoming the sole owner. After discussions with Rick, who worked for ATSCO, and reviewing a report valuing the company at approximately $890,000, he decided to sell ATSCO to Rick.

{¶7} A purchase agreement was entered into by Rick and Steven on January 1, 2001. It provided that Steven would sell to Rick his "Shares [of ATSCO] for a total purchase price of Eight Hundred Ninety Thousand Dollars ($890,000), which purchase price shall be due and payable as set forth and provided in Paragraph 2 of this Agreement." Paragraph 2 provided that, on the closing date of November 1, 2001, Rick "shall issue and deliver to Seller Purchaser's (sic) the sum of Five Hundred Thousand Dollars ($500,000) and a Promissory Note in the principal sum of Three Hundred and Ninety Thousand Dollars," further providing that the "Note shall include interest at an imputed interest rate at the rate of five percent (5%) per annum." The Note was to be due and payable on February 17, 2005: "however, Purchaser will have the right to extend the due date for repayment if he is able to reasonably demonstrate to Seller that Purchaser is unable to make such payments on the due date." The agreement provided that the closing would occur on November 1, 2001, at which time Steven was to deliver certificates of his shares and a resignation as director of the company and Rick was to provide the Note.

{¶8} Steven testified that Rick did not pay him $500,000 on November 1 nor $390,000 on February 17. Steven did not enforce the payments because Rick stated he could not make them in a lump sum. Rick did make some payments on the agreement

3

over the years. Steven became aware the company was sold in 2014 but still had not been paid what he was owed at that time.

{¶9} Steven testified that in addition to the purchase agreement there was also an employment agreement, although the written copy he had was not signed, as he continued to work at ATSCO after the sale until at least 2005. He and Rick discussed the company continuing to pay benefits Steven previously received through his employment, including an American Express card "they wanted me to continue to use" and his car payment. He testified that he did receive paychecks from ATSCO, some but not all of his car payments were paid, and Rick did pay all American Express bills. He was supposed to receive life insurance but Rick eventually cancelled it.

{¶10} Steven testified that he gave Rick credit for various payments made over the years toward the purchase price, either from lump sums paid or payroll checks and that Rick had paid $623,363.91 overall. Steven also believed he was owed interest in an amount of over $344,000.

{¶11} Steven's daughters and Rick's sisters, Amy Sabath and Lori Bastion, testified that their father had financial difficulties after selling the company and about Rick's failure to make all required payments. They tried to speak with Rick about the issue but he refused. Amy testified that Steven did continue to work at ATSCO after he sold the company until at least 2003. Janet Sabath, Steven's wife, testified that Steven had continued to work at ATSCO until 2007 when he suffered a spinal cord injury.

{¶12} Following the close of Steven's case, the court excluded as an exhibit the copy of the written employment agreement, as it was not signed by the parties. The court granted a directed verdict in Rick's favor as to the claims for misrepresentation, fraud,

4

and conversion because they related to the third-party that subsequently purchased ATSCO rather than Steven.

{¶13} On October 30, 2019, the second day of trial, Rick filed a Motion to Present Trial Testimony of Thomas J. Scanlon Esq. Via Deposition Transcript. Therein, he alleged that Scanlon suffered significant health issues and a severe fall in September, resulting in multiple fractures, was presently hospitalized, would remain in a rehabilitation facility until the end of November 2019, and was unable to use a walker or wheelchair. Prior to the presentation of Rick's case, the parties argued the motion and the trial court ruled that the deposition would not be admissible, noting it would be unfair to admit a deposition that was not taken as a trial deposition.

{¶14} Rick Sabath, who initially worked at ATSCO as a sales representative, entered the agreement to buy ATSCO from his father on January 1, 2001. Prior to entering the agreement, he sought and received a valuation for the business of approximately $890,000. After the purchase in 2001, the company lost money and Rick had difficulty getting bank loans to pay the amount discussed in the agreement. Rick testified that he and Steven had a discussion in which his father indicated, "I don't care how you pay me, pay me any way you can and we'll go from there." He testified that this included keeping Steven on the payroll although he no longer worked for the company and paying bills such as his car payment and American Express charges, an ATSCO Mastercard in Steven's name and other bills such as insurance and club memberships to the Mentor Harbor Yacht Club and Duquesne Club. Various exhibits were presented showing payments from Rick or ATSCO for these bills or to Steven directly. Rick testified that he would pay bills such as the car payment whenever they were presented to him by

5

Steven and payments were made to Steven totaling $1,576,448.90. He testified that he had not realized he overpaid Steven but also that he continued to pay when Steven asked for money because he wanted to help his father.

{¶15} Rick testified that although the agreement provided for preparation of a Promissory Note, one was never signed. He also explained that his father ceased working for ATSCO at the end of 2000. Rick did not receive the stock certificates for the company from his father. Rick sold ATSCO for $ 7.6 million in August 2014.

{¶16} Fabian O'Connor, the CPA who had prepared the valuation of ATSCO in 2000, testified that he had been involved with financial dealings with the company including preparing tax documents. He was present during a discussion in 2001 between Rick and Steven where they discussed the payment arrangement for the company purchase. He testified that his understanding was that Rick would make payments to Steven in different ways he called a "package of payments" including American Express payments and car payments.

{¶17} James Becker, who worked at ATSCO, testified that when he started in 2002, Steven was retired. Becker wrote checks from the company to Steven pursuant Rick's request, including payments for Steven's car and American Express card. Michael Sivula, who worked for ATSCO from 2012 to 2014 testified that he was also aware of Steven's bills being paid by ATSCO/Rick. He testified that these payments were accounted for as distributions to Rick from the company rather than company expenses.

{¶18} At the close of the case, the trial court granted Steven's motion for directed verdict on the Unjust Enrichment counterclaim on the grounds that it was not demonstrated Steven was unjustly enriched since Rick voluntarily made extra payments

to his father based on Rick's own testimony.

{¶19} The jury returned a verdict in favor of Steven on the claim for Breach of Contract on the Purchase Agreement in the amount of $164,893 and in favor of Rick on claims for breach of the employment agreement, Promissory Estoppel, and Unjust Enrichment. The court memorialized this verdict in a November 6, 2019 Judgment Entry.

{¶20} On November 20, 2019, Steven filed a Motion for Prejudgment Interest from February 17, 2005, through November 6, 2019, which was opposed by Rick.

{¶21} On December 2, 2019, Rick filed a Motion for Judgment Notwithstanding the Verdict as to the Breach of Contract claim, arguing that the evidence presented at trial was insufficient to support the jury's verdict.

{¶22} In a January 2, 2020 Judgment Entry, the court awarded prejudgment interest from the date that Rick sold the company, August 13, 2014, because "at that point Defendant had no intention of making additional payments and the evidence indicated that Defendant had the ability to pay the remaining balance." It denied Rick's Motion.

{¶23} Rick appealed from several of the foregoing judgments and the appeals were consolidated. On appeal, he raises the following assignments of error:

{¶24} "[1.] The trial court erred in denying Rick's motion for judgment notwithstanding the verdict on Steve's claim for breach of the Purchase Agreement.

{¶25} "[2.] The trial court erred in denying Rick's motion to present the trial testimony of Thomas J. Scanlon via deposition transcript.

{¶26} "[3.] The trial court erred in granting a directed verdict on Rick's claim for unjust enrichment.

{¶27} "[4.] The trial court erred in granting Steve's motion for prejudgment

7

interest."

{¶28} In his first assignment of error, Rick argues that Steven did not present sufficient evidence as to each element of the breach of contract claim to support a verdict and, therefore, the trial court erred in denying his motion for judgment notwithstanding the verdict on this claim.

{¶29} "To establish a claim for breach of contract, a plaintiff must prove the existence of a contract, performance by the plaintiff, breach by the defendant, and resulting damages to the plaintiff." *Extendicare Health Services, Inc. v. Dunkerton*, 2017-Ohio-427, 84 N.E.3d 92, ¶ 11 (11th Dist.). "The damages awarded for a breach of contract should place the injured party in as good a position as he would have been but for the breach." (Citation omitted.) *Walters v. Goddard*, 2018-Ohio-5184, 127 N.E.3d 322, ¶ 22 (11th Dist.).

{¶30} Pursuant to Civ.R. 50(B), a party may file a post-trial motion to set aside the judgment. "We review de novo a trial court's ruling on a motion for [a judgment notwithstanding the verdict], as it presents a question of law." *Jack F. Neff Sand & Gravel, Inc. v. Great Lakes Crushing, Ltd.*, 11th Dist. Lake No. 2012-L-145, 2014-Ohio-2875, ¶ 48. In the case of such motion, "[t]he evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon [a motion for judgment notwithstanding the verdict]." *Posin v. A.B.C. Motor Court Hotel*, 45 Ohio St.2d

8

271, 275, 344 N.E.2d 334 (1976). Rather, "the question is whether there is sufficient evidence regarding a particular issue for the trial court to submit the issue to the jury for determination." *D.A.N. Joint Venture III, L.P. v. Med-XS Solutions, Inc.*, 11th Dist. Lake No. 2011-L-056, 2012-Ohio-980, ¶ 31; *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 25. The reasonable minds test applied in the case of a motion for judgment notwithstanding the verdict requires the court to determine "whether there exists any evidence of substantial probative value in support of [the claims of the non-moving party]." (Citation omitted.) *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679-680, 693 N.E.2d 271 (1998).

{¶31} Rick's argument that there is a lack of evidence to support a judgment on the claim for breach of the purchase agreement is based upon the fact that the jury found there was no breach of the oral employment agreement. He contends that if the jury found there was no employment agreement, then all payments made by Rick, regardless of whether they were payroll, American Express, car payments, or others should have been credited toward the payments made for the overall ATSCO purchase price and such payments were well in excess of the $890,000 owed under the purchase agreement.

{¶32} We disagree. The jury's finding of no breach of the employment agreement could have been for many reasons. No signed agreement was submitted as evidence so there was limited testimony about what the terms of such an agreement were. Further, the jury could have concluded that there was not an employment agreement requiring particular benefits but still found that payments made by Rick for Steven's various bills and liabilities were made to help his father or were because Steven continued to work for the company. Alternatively, the jury could have found that all required payments under

9

an employment agreement were made, so it was not breached, but payments remained under the purchase agreement. It is worth noting that, although Rick argues that the jury's verdict tends to show it found no employment agreement existed, the jury verdict form was captioned "Plaintiff's Claim for Breach of the Employment Agreement" and provided spaces for the jury to select either that it does "hereby find in favor of the plaintiff Steven P. Sabath and against Defendant Rick J. Sabath and award damages in the amount of $_____" or "in favor of Defendant Rick J. Sabath." Thus, the jury's verdict was merely that there was no breach of the employment agreement and could have been based on multiple reasons outlined above, including that an employment agreement existed but was not breached. There were many ways to interpret the evidence but none point to a lack of sufficient evidence on the elements of a breach of the purchase agreement claim.

{¶33} Further, Rick's argument that the evidence demonstrated he fulfilled his contractual obligations is reliant on accepting his version of the testimony that amounts paid were to be credited toward the purchase agreement rather than Steven's version that this was not the parties' agreement. Steven testified that he was paid only $623,363.91, although the contract was for $890,000, so the $164,893 the jury awarded was well within the evidence presented, presuming the jury believed all or part of Steven's testimony. As noted above, we are not to make credibility determinations in the analysis on a motion for judgment notwithstanding the verdict and it was within the jury's function to make such decisions. There was testimony and evidence to support a claim that the required payments were not made under the purchase agreement which would, of course, be a breach. Since reasonable minds could have concluded that the evidence supported

10

a finding of damages and that the whole amount of the contract was not paid by Rick, and when construing the evidence most strongly in favor of Steven, there were no grounds to grant the motion for judgment notwithstanding the verdict.

{¶34} The first assignment of error is without merit.

{¶35} In his second assignment of error, Rick argues that the trial court erred in denying a motion to present the testimony of attorney Thomas Scanlon, Rick's attorney who prepared drafts of the purchase agreement, via a discovery deposition transcript because Scanlon was unable to testify at trial due to his poor health.

{¶36} Decisions regarding the admission or exclusion of evidence, including deposition testimony, are reviewed under an abuse of discretion standard. *Cobb v. Shipman*, 2015-Ohio-2604, 35 N.E.3d 560, ¶ 19 (11th Dist.); *Schwartz v. Tedrick*, 2016-Ohio-1218, 61 N.E.3d 797, ¶ 43 (8th Dist.). "An abuse of discretion is a term of art reflecting a court's exercise of judgment that fails to comport with the record or logic." (Citation omitted.) *Pirock v. Crain*, 11th Dist. Trumbull No. 2019-T-0027, 2020-Ohio-869, ¶ 68. "An abuse of discretion is the trial court's 'failure to exercise sound, reasonable, and legal decision-making.'" *Id.*, citing *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004).

{¶37} Pursuant to Civ.R. 32(A)(3)(c): "At the trial * * * any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any one of the following provisions: * * * The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds * * * that the witness is unable

11

to attend or testify because of age, sickness, infirmity, or imprisonment."

{¶38} "It is well-established that the burden rests on the proponent of the deposition to satisfy the requirements of Civ.R. 32(A)(3)." *Schwartz* at ¶ 45. The discretion afforded to the trial court in applying Civ.R. 32(A)(3) in particular has been emphasized, with this court finding Civ.R. 32(A)(3) provides that depositions "may" be used but not that they "shall be" admitted as evidence. *Cobb* at ¶ 19; *Schwartz* at ¶ 45 ("Civ.R. 32(A)(3), by its own terms, does not mandate the substitution of a deposition at trial").

{¶39} The trial court listened to argument on this issue and primarily expressed concern with the fact that the request to use the deposition as testimony was not raised earlier and that the deposition was a "discovery deposition" rather than a "trial deposition." While we recognize the authority of the lower court to exercise its discretion in these circumstances, we question the trial court's basis for declining to allow admission of Scanlon's deposition testimony.

{¶40} Pursuant to the rule, admission of the deposition may be permitted when it is filed "at least one day before the day of trial" and the witness is unable to appear due to sickness or infirmity. Civ.R. 32(A)(3). Both of these circumstances were met. The deposition was filed well in advance of trial and extensive affidavit testimony and argument was presented showing Scanlon's inability to appear due to his medical condition. The affidavit of his law partner explained he had fallen in September 2019, after the deposition was taken, broke his pelvis and arm, is presently on "heavy pain medication" and at a rehabilitation hospital, and cannot sit up when transported or use a walker or wheelchair. The court explicitly recognized that "it had no doubt that Mr.

12

Scanlon is in bad physical shape but there's not, that's not my issue." Thus, despite recognizing that Scanlon was not able to appear, and despite the fact that the injuries complained of occurred after the discovery deposition was taken (and thus may have also interfered with the ability to provide an additional deposition), the court refused admission.

{¶41} Given the foregoing, the sole basis for denial appears to be concern over the deposition being a "discovery deposition," as the court emphasized it was "inherently unfair" to admit such a deposition. However, it has been held that Civ.R. 32 makes "no distinction between discovery and trial depositions." *Beckman v. Yellow Freight Sys., Inc.*, 9th Dist. Summit No. 17845, 1997 WL 72104, *3 (Feb. 12, 1997); *Wasinski v. PECO II, Inc.*, 189 Ohio App.3d 550, 2010-Ohio-4293, 939 N.E.2d 883, ¶ 18 (3d Dist.) (since there is no distinction made in Civ.R. 32 between discovery and trial depositions, filing a witness' "discovery deposition in anticipation of using it at the trial was both reasonable and permissible under the civil rules"). There is no reason admission of a discovery deposition would have caused prejudice as Steven's counsel was present at the deposition and questioned Scanlon. *Beckman* at *3. While Rick did not request to utilize the deposition until the second day of trial, this also would cause no prejudice since the deposition had already been completed, filed, and Steven's counsel was not required to prepare anything in response to a ruling at this stage in the trial. *See Raybourn v. Buroker*, 2d Dist. Miami No. 82-CA-61, 1983 WL 2552, *10 (Nov. 22, 1983) (deposition filing requirement "puts opposing parties on notice that the deposition might be used in evidence").

{¶42} The proper application of discretion by a trial court would relate to assessing whether a witness is actually unable to appear and the circumstances set forth in Civ.R.

13

32 are truly applicable, rather than a determination that the court finds certain types of depositions or testimony preferable. Given these circumstances, we do not believe the court properly exercised its discretion in accordance with the purposes of the rule. *See Burnworth v. Ohio Bell Tel. Co.*, 5th Dist. Stark No. CA-9066, 1993 WL 289846, *8 (July 19, 1993) (where the court recognized that the deposed party was geographically distant from the court, a criteria for admitting a deposition under Civ.R. 32(A)(3), but still refused to allow submission of a discovery deposition in the place of testimony, the court erred in failing to do so).

{¶43} Nonetheless, the exclusion of evidence or testimony must result in material prejudice for reversal to be warranted. *Pirock*, 2020-Ohio-869, at ¶ 95; *Cobb*, 2015-Ohio-2604, at ¶ 32-35; Civ.R. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."). Rick's argument that the exclusion of Scanlon's testimony impacted the outcome of the trial lacks merit.

{¶44} Rick points to two areas of testimony he contends impacted the outcome of the trial. First, Scanlon testified regarding his discussions with Steven as to the parties' potential payment arrangement. Regarding this issue, Scanlon testified that he spoke to Steven only one time, prior to preparing any documents related to this matter, and that Steven had discussed getting paid "out of the business" and that he and Rick would determine how payment would occur. We do not find this testimony would have impacted the outcome of the trial. Evidence of prior discussions or negotiations before a written agreement that contradict its terms is improper parol evidence. *Galmish v. Cicchini*, 90 Ohio St.3d 22, 27, 734 N.E.2d 782 (2000). The discussions of the parties before they

14

reached the written agreement do not show what they ultimately agreed upon; the purchase agreement itself does. This testimony was contradicted by the terms of the agreement which showed lump sums to be paid at certain times. Furthermore, the testimony presented by Rick at trial was that he attempted to get a loan to pay the $500,000, failed, and had discussions with his father about paying in other ways, essentially arguing a modification of the parties' agreement under the contract (an argument which he continues to make in various portions of his brief, asserting that "the parties altered the Purchase Agreement to allow for payments"). Scanlon's testimony of what occurred before the contract was executed does not help support this argument. Significantly, Scanlon's testimony indicated that the final agreement actually signed by the parties, although it may be similar to drafts he prepared, was not drafted by him. Thus, even if his testimony were permissible and admitted, it would not have shown what the parties ultimately had agreed to regarding payment. Again, the writing of the purchase agreement itself is the best evidence of such agreement.

{¶45} Nonetheless, it is evident that the jury did credit to Rick many of the payments he made by various means, as they did not issue a judgment in the entire amount of the contract but instead found he paid the majority of the money owed. Thus, it is evident they did find some merit to his argument that the payments made, although not in lump sums, were permissible under the contract. Thus, Scanlon's testimony would have had no impact in this regard.

{¶46} As to the other testimony, in which Scanlon discussed the meaning of the term "imputed interest," any testimony as to this would again have no impact on the jury's finding. It was simply Scanlon's discussion of why he included the term and what he

believed it to mean. Rick himself later argues in the fourth assignment of error that the term is unambiguous and no evidence is properly admitted to demonstrate its meaning outside of the terms of the contract. Thus, this testimony, under his own argument, would be improper and irrelevant.

{¶47} The second assignment of error is without merit.

{¶48} In his third assignment of error, Rick argues that the trial court erred in granting a directed verdict on his counterclaim for unjust enrichment, arguing that it improperly weighed evidence in this determination.

{¶49} The test applied in a directed verdict is the same as that applied to a motion for a judgment notwithstanding the verdict and thus, this issue is evaluated under a de novo standard of review. *Turek v. Phelps*, 11th Dist. Ashtabula No. 2016-A-0012, 2016-Ohio-7552, ¶ 29-30; *Posin*, 45 Ohio St.2d at 275, 344 N.E.2d 334. We must assess the sufficiency of the evidence, not the weight of the evidence or credibility of witnesses, and apply the reasonable minds test set forth above. *Turek* at ¶ 29; *Texler*, 81 Ohio St.3d at 679-680, 693 N.E.2d 271.

{¶50} "The elements of unjust enrichment are: '(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment.'" *Giles v. Hanning*, 11th Dist. Portage No. 2001-P-0073, 2002-Ohio-2817, ¶ 13, quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (1984). "Unjust enrichment occurs when one individual receives a benefit which, in justice and equity, belongs to another." *Thompson v. Custer*, 2018-Ohio-4476, 124 N.E.3d 257, ¶ 46 (11th Dist.). "The doctrine of unjust enrichment provides an equitable

16

remedy imposed to prevent injustice." *Giles* at ¶ 13. To demonstrate a claim for unjust enrichment "'[i]t is not sufficient for the plaintiffs to show that [they have] conferred a benefit upon the defendants. [Plaintiffs] must go further and show that under the circumstances [they have] a superior equity so that as against [them] it would be unconscionable for the defendant[s] to retain the benefit.'" *U.S. Health Practices, Inc. v. Blake*, 10th Dist. Franklin No. 00AP-1002, 2001 WL 277291, *2 (Mar. 22, 2001), quoting *Katz v. Banning*, 84 Ohio App.3d 543, 552, 617 N.E.2d 729 (10th Dist.1992).

{¶51} We recognize that a directed verdict cannot be used to substitute the judge's decision for that of the trier of fact. However, under the circumstances of this case, we do not find that the trial court erred by issuing a directed verdict.

{¶52} Rick's claim for unjust enrichment was that he paid more than the $890,000 owed under the purchase agreement and it would be unjust for Steven to keep this money to which he was not entitled. However, Rick's testimony eviscerates any argument that Steven retained payment under unjust circumstances or that it would be unconscionable for him to retain payments made by Rick to him. Rick testified, when asked why he continued to make payments to Steven after 2005, when Rick claimed he had completed the $890,000 payment: "I had an obligation, my father wanted just more cash. He needed money and wanted money, more money. * * * It didn't really register I'm running the bill of $890,000 so I continued to pay his bills so I had. I was doing well so I had no problem sharing money with my father from the creation of the company that was going on. I had no problem continuing to share it with him after that point and I kept going. And then when my father got sick in 2007 * * * and lost his money then we had that conversation then I was continuing really to help really just they needed some financial help and so I

17

did." He made other references to making payments to "help his father out" such as paying life insurance payments for a number of years and further explaining that after they reached the amount owed, "I just continued to help him out after that, sent him money." Since Rick agreed that he made the payments to help his father, it was not demonstrated that, if extra payments were made, it would be inequitable for Steven to retain them.

{¶53} We also note that the jury appears to have determined that although Rick made various payments in many methods, some of these were sufficient to satisfy the purchase agreement and some were not. If they had found he made more payments than Steven was entitled to receive, they would not have issued judgment in his favor. Even if the jury had been presented with this claim, it is inconsistent with the evidence and judgment that they would have found unjust enrichment occurred.

{¶54} The third assignment of error is without merit.

{¶55} In his fourth assignment of error, Rick argues that the trial court erred in granting Steven's motion for prejudgment interest and awarding interest pursuant to R.C. 1343.03(A) because the parties had already provided for interest in the purchase agreement. The court ordered that Rick pay prejudgment interest beginning August 13, 2014, the date he sold ATSCO.

{¶56} R.C. 1343.03(A) provides the following:

> In cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, * * * upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised

18

Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.

{¶57} This court has held that "whether a party is entitled to an award of prejudgment interest pursuant to R.C. 1343.03(A) is a question of law subject to de novo review" since that statute "automatically bestows a right to statutory interest as a matter of law on a judgment." (Citation omitted.) *Gray v. Petronelli*, 11th Dist. Trumbull No. 2016-T-0030, 2017-Ohio-2601, ¶ 55. It is, however, within the trial court's discretion to determine "the date upon which the prejudgment interest should begin to accrue." *Id.*

{¶58} An award of prejudgment interest would generally be appropriate where there is a contract for payment that the breaching party failed to pay. *Jack F. Neff Sand & Gravel, Inc.*, 2014-Ohio-2875, at ¶ 68. Rick argues, however, that such an award was impermissible since this was an instance where the parties had already included interest in their contract, disallowing an additional award of interest. This is based upon the clause in the parties' purchase agreement which required Rick to "issue and deliver to Seller" a promissory note for $390,000 on the closing date and that "[t]he Note shall include interest at an imputed interest rate at the rate of five percent * * * per annum." He contends that since the parties provided for imputed interest, i.e., that the interest "was already accounted for in the $890,000" and the "principal amount" includes both the interest and the principal, it is improper to include any additional award of interest.

{¶59} There is no dispute, however, that Rick never executed or delivered a promissory note. While such note was to provide for imputed interest, the purchase agreement does not contain a clause mandating or providing for such interest. Further, albeit in a different type of agreement, this court has held that where parties provide for

19

no interest before maturity but their agreement is silent with respect to interest after maturity, the non-breaching party is entitled to statutory interest following a breach pursuant to R.C. 1343.03. *Harris v. Harris*, 11th Dist. Lake No. 97-L-076, 1998 WL 682358, *2 (Sept. 25, 1998). Here, even assuming the "imputed interest" provision applied in the absence of the note, the agreement provided that the "principal and interest" were due on February 17, 2005. Thus, this provision did not anticipate what interest would apply if there was a default. To find otherwise would lead to an inequitable result which does not penalize Rick for remaining in default for an extended and indefinite period of time. *See id.*

{¶60} Rick's argument as to what attorney Scanlon believed the parties intended contradicts his own argument that evidence outside of the agreement should not be allowed to demonstrate the plain meaning of an agreement. Nonetheless, the words of the agreement itself provide only for a future document to include a term of imputed interest as outlined above.

{¶61} Finally, Rick argues that interest should not have been ordered for the time between when Steven dismissed a previously filed 2015 action and the matter was refiled because interest should not be owed while he voluntarily chose not to pursue the action. Rick cites no authority for this proposition. As he notes, "[t]he award of prejudgment interest is compensation to the plaintiff for the period of time between accrual of the claim and judgment." *Royal Elec. Constr. Corp. v. Ohio State Univ.*, 73 Ohio St.3d 110, 117, 652 N.E.2d 687 (1995). As the trial court found, applying the parties' agreement, the claim accrued when Rick was able to pay, which date it deemed to be when ATSCO was sold for over 7 million dollars. The fact that Steven chose to file a claim, voluntarily

dismiss it for reasons not in the record, and refile, do not alter the fact that Steven was owed payment under the contract during that time.

{¶62} The fourth assignment of error is without merit.

{¶63} For the foregoing reasons, the judgments of the Lake County Court of Common Pleas are affirmed. Costs to be taxed against appellant.


CYNTHIA WESTCOTT RICE, J.,

THOMAS R. WRIGHT, J.,

concur.